**UNITED STATES BANKRUPTCY COURT
FOR THE DISTRICT OF MARYLAND
(Greenbelt Division)**

| | | |
|---|---|---|
| In re: | : | |
| | : | |
| CR-RSC TOWER I, LLC, et al., | : | Case Nos. 09-21054, 09-21055, |
| | : | 09-21057 and 21059 |
| Debtors. | : | (Chapter 11) |
| | : | Jointly Administered Under Case No. |
| | : | 09-21054 |
| | : | |
| CR-RSC TOWER I, LLC, et al., | : | |
| | : | |
| Plaintiffs, | : | Adversary Proceeding No. 10-00347 |
| | : | |
| v. | : | |
| | : | |
| RSC TOWER I, LLC, et al., | : | |
| | : | |
| Defendants. | : | |

**RSC TOWER I, LLC AND RSC TOWER II, LLC'S (A) OPPOSITION TO
DEBTORS' MOTION FOR PARTIAL SUMMARY JUDGMENT,
AND (B) CROSS-MOTION FOR SUMMARY JUDGMENT**

Plaintiffs RSC Tower I, LLC and RSC Tower II, LLC (together "RSC"), by and through their undersigned counsel, oppose Debtors' Motion for Partial Summary Judgment (the "Motion") and move this Court to enter summary judgment in its favor (the "Cross-Motion") on all counts of Debtors' Verified Complaint for Relief From Violation of Remand Order and Automatic Stay (the "Stay Complaint"). In support of its opposition to the Motion and in support of its Cross-Motion, RSC states as follows:

## STATEMENT OF MATERIAL FACTS NOT IN GENUINE DISPUTE

I.      **The Circuit Court Litigation.**

In November 2006, RSC commenced a state court action against the Debtors in the Circuit Court for Montgomery County, Maryland based on the Debtors' breaches of the parties' two Ground Leases.  **Ex. 1.**[1]  RSC sought, among other things, specific performance and declaratory relief as a remedy for the Debtors' breaches.  On April 4, 2007, the Circuit Court found each Debtor liable for breaching both Ground Leases and ordered the Debtors to specifically perform them (the "Declaratory Judgment").  **Ex. 3** at 4.  The Court's written order preserved RSC's right to seek damages for the breaches the Debtors were found to have committed, as well as future breaches.  *Id.* at 6.  Pursuant to the prevailing party clause in the Ground Leases, on June 11, 2007, the Circuit Court found the Debtors jointly and severally liable for RSC's litigation expenses incurred prior to March 31, 2007 (the "First Award").  **Ex. 4** at 2.  The Debtors appealed the Declaratory Judgment and the First Award to the Maryland Court of Special Appeals, which affirmed the Declaratory Judgment on August 4, 2008.  **Ex. 6.**  Among other things, the Court of Special Appeals held that the Debtors' actions constituted a breach of the covenant of good faith and fair dealing implied in every contract under Maryland law.  *Id.* at 48, 52-53.  Thereafter, the Debtors voluntarily dismissed their appeal from the First Award, which they paid in full.  **Ex. 7**.

In late 2008, in accordance with the reservation contained in the Declaratory Judgment, RSC filed in the Circuit Court a Supplemental Application for Litigation Expenses it had incurred between April 1, 2007 and September 30, 2008 (the "Supplemental Application").  **Ex. 33** at Docket No. 177.    Shortly thereafter, RSC filed a Motion for Supplemental Relief and an

---

[1]      Attached to this Memorandum are copies of all cited papers, in date order, along with an exhibit index.  Many of the cited court papers included voluminous exhibits, as do several of the papers filed in the Circuit Court and cited herein.  To avoid unnecessarily deluging the Court with paper, RSC has not attached copies of the exhibits attached to the court papers, but can provide any or all of them to the Court should the Court so request.

Interlineated Complaint seeking additional relief for the Debtors' breaches of contract, including legal damages and delay damages.  **Exs. 8** at ¶17; **Ex. 9** at ¶7.[2]  The gravamen of RSC's claims were that all of the Debtors had breached both Ground Leases by refusing to give proper estoppel certificates and by filing and maintaining administrative appeals attacking RSC's governmental approvals.  **Ex. 1A** at Counts III and IV; **Ex. 8** at ¶¶ 1, 9, 10; **Ex. 9.**[3]

On June 18, 2009, after the Circuit Court had presided over two days of evidentiary hearings on RSC's Supplemental Application, and after the Circuit Court had scheduled a two-week jury trial on RSC's claims for additional relief to commence March 1, 2010 (**Ex. 33** at Docket No. 223), each of the Debtors filed voluntary chapter 11 petitions in this Court.  Thereafter, on June 24, 2009, the Debtors noticed the removal of the Montgomery County litigation to this Court pursuant to 28 U.S.C. § 1452.

## II.    The Remand Orders.

On June 30, 2009, RSC filed a Motion for Remand, Relief from the Automatic Stay and Suspension of Bankruptcy Proceedings (the "Remand Motion") [Docket No. 24].  By Order entered July 8, 2009 (the "First Remand Order") [Docket No. 33], this Court granted, in part, the Remand Motion, thereby allowing the Circuit Court to resolve RSC's then-pending Supplemental Application and to enter a monetary judgment on the Supplemental Application.  **Ex. 10.**  By Order dated September 8, 2009 and entered September 14, 2009, pursuant to the First Remand Order, the

---

[2]    Under Maryland law, a party seeking additional relief pursuant to a previously issued declaratory judgment need not file a new complaint and may request the relief by way of a Motion.  *Nova Research, Inc. v. Penske Truck Leasing Co., L.P.,* 405 Md. 435, 460 (2008).

[3]    The original Circuit Court action was assigned Case No. 276438.  Debtors moved to dismiss and strike the Motion for Supplemental Relief and Interlineated Complaint filed in that case, arguing that the claims had to be brought through a new complaint.  While disagreeing with Debtors' position, RSC filed a new complaint, Case No. 309540-V, on March 3, 2009, seeking the same relief.  **Ex. 12.**  Both cases followed the same Scheduling Order and were ultimately consolidated.  **Ex. 34** at Docket No. 94.

Circuit Court found the Debtors jointly and severally liable to RSC for $902,843.71 in litigation expenses (the "Supplemental Award").  **Ex. 14** at 1.

A hearing was held before this Court on September 22, 2009 on the remaining aspects of the Remand Motion.  At the conclusion of the hearing, this Court granted in part and denied in part the Remand Motion and instructed the Debtors and RSC to submit a consent order consistent with the ruling from the bench.  On October 26, 2009, RSC filed its proofs of claim, again making clear that it sought to hold each Debtor jointly and severally liable.  **Ex. 18** at ¶10.  After another hearing on November 24, 2009, this Court, on December 4, 2009, entered a second order granting, in part, the Remand Motion (the "Second Remand Order") [Docket No. 91], thereby allowing the Circuit Court to proceed with a trial on RSC's claims that the Debtors had breached the Ground Leases and to liquidate the amount of RSC's monetary claims against the Debtors.  **Ex. 19.**

In summary, before this Court issued its First Remand Order, based on the then-operative pleadings, the Circuit Court had entered two final, non-appealable judgments finding each Debtor liable for breaches of both Ground Leases, finding each Debtor liable for the litigation expenses caused by breaches of both Ground Leases, and finding each Defendant liable for breach of the implied covenant of good faith and fair dealing.  **Ex. 3; Ex. 4; Ex. 6.**  Moreover, before entry of the Second Remand Order, based on the then-operative pleadings, the Circuit Court had issued the Supplemental Award, again finding each Debtor jointly and severally liable for litigation expenses caused by breaches of both Ground Leases, and RSC had filed eight proofs of claim that were consistent with the existing claims of joint and several liability.  **Ex. 14** at 1, **Ex. 18**.

### III.    The Third Amended Complaint.

As they note in their Motion, the Debtors were represented by the law firm of Hogan & Hartson, LLP from the inception of the suit through August 4, 2008, when the Maryland Court of

Special Appeals affirmed the Circuit Court's Declaratory Judgment. After the affirmance, the Debtors engaged new counsel (Cooter & Mangold) who continuously raised arguments that had previously been resolved adversely to the Debtors and who attempted to distort, ignore, or dispute the record of the prior proceedings. For example, notwithstanding the fact that the Declaratory Judgment constituted a final, non-appealable judgment for breach of contract against the Tower II Defendants in favor of the Tower I Plaintiff, Defendants filed a dismissal motion claiming that the allegations of the Complaint did not justify the imposition of such liability. **Ex. 13.** In addition, notwithstanding the fact that they had previously argued that good faith was one of the key issues in the case, the Debtors filed a motion in limine claiming that their good faith, or lack thereof, was irrelevant. **Ex. 27B.**[4]

In light of the likelihood of an appeal, and to ensure that the record was crystal clear as to what issues had been joined and were to be tried, on February 16, 2010, RSC sought leave to file a Third Amended Complaint to include, among other things, the express allegation that the Debtors' actions constituted a violation of the implied covenant of good faith and fair dealing and to expressly include the words "joint and several liability." **Debtors' Mot. at Exs. G and H.** The Debtors' filed an opposition arguing, among other things, that the amendment would violate the automatic stay and this Court's Remand Orders. **Debtors' Mot. at Ex. I.** On Thursday morning, February 25, 2010, Judge McGann's chambers informed the parties that the Third Amended Complaint would be permitted and, on March 1, 2010, Judge McGann orally announced that decision on the record.

---

[4]      Likewise, the Debtors claimed that Plaintiffs were not the real party in interest notwithstanding the fact that three judgments had already been entered in Plaintiffs' favor. **Ex. 27** at 9.

## IV.   **The Hogan & Hartson Discovery And Trial Rulings.**

During depositions of the Debtors' representatives in the lead-up to the March 2010 jury trial, RSC sought to discover why the Debtors had made the business decision to interfere with RSC's development rights under the Ground Leases.  The Debtors essentially refused to answer these questions, claiming that they made no independent decisions and relied entirely upon the advice of their lawyers at Hogan & Hartson.  For example, Floyd E. Davis testified:

> Q:   Your position in the fall of 2006 was you wanted apartments built on the land, you just wanted them built by somebody other than RSC?

> A:   Once again, all of this, our positions came out in consultation, you know, with counsel, and family members were there. That's all I'm going to say at this point.

**Ex. 23** at 299:12-300:11.  John G. Davis, was even more express, claiming that Hogan and Hartson was "driving the bus."  **Ex. 20** at 391:20-392:5.  The Debtors further testified, in an effort to distance themselves from their own business decisions, that they had asserted claims for malpractice against Hogan & Hartson based on that firm's alleged advice to them.

The Debtors then voluntarily produced, at RSC's request, correspondence between Hogan & Hartson and the Debtors' new counsel, in which Hogan & Hartson claimed that the Debtors had "approached Hogan & Hartson to obtain this Firm's assistance in opposing the efforts of the RSC Entities  to convert a luxury condominium back to a rental apartment project" and that the Debtors "had a strong financial incentive to oppose that conversion because the condominium project would have required the RSC Entities to purchase the property at a price of $58 million for the Tower One property alone, as opposed to paying relatively small lease payments if the apartment project went forward."  **Ex. 11** at 1.  The Debtors took the position that this correspondence was not a privileged communication. **Ex. 25** at 7.

In light of the Debtors' deposition testimony, together with their contention that their communications with Hogan & Harston regarding the basis for their litigation positions was not privileged, RSC sought a limited deposition of a Hogan & Hartson representative on five subject areas and limited document discovery on nine categories of documents.  **Ex. 21**.  Both the Debtors and Hogan & Hartson objected and sought a protective order with respect to RSC's subpoena. After convening a hearing, the Circuit Court permitted the limited discovery, finding that some of the discovery sought was not privileged and that any privilege had been waived.  **Ex. 26** at 60-62.[5]

In ruling that the discovery was permissible, the Circuit Court made clear that "when we get to trial what's actually admissible at that time remains to be seen," *id.* at 61:13-14, and later reiterated that he did not "want to get into Hogan and Hartson if we don't have to."  **Ex. 28** at 85:8-9.  Although the Circuit Court gave the Debtors an opportunity to avoid admission of their purportedly privileged communications at trial, the Debtors chose not to avail themselves of that opportunity and, through the live trial testimony of Skip Davis, again disclaimed any ability to give a reason for their actions other than the advice of counsel.[6]  The Circuit Court thus overruled the Debtors' objection to the admission of some purportedly privileged communications during the examination of Mr. Davis.  The Circuit Court held that some of the communications were not privileged and that any privilege with respect to other communications had been waived by Mr. Davis' testimony.  *See, e.g.,* **Ex. 29** at 98-101 (overruling objection to the admission of a letter from Debtors' attorney forwarding documents on grounds that it was not privileged); *see, e.g.,* **Ex.**

---

[5]    Contrary to the Debtors' suggestion, RSC was not awarded custody of any documents; it was simply permitted the right to copy and inspect documents responsive to its subpoena *duces tecum* and to depose a representative of Hogan & Hartson.

[6]    During his examination, Mr. Davis repeatedly invoked the "advice of counsel" argument. **Ex. 29** at 134:6-9; 142:19-23; 186:17-19; 188:23-189:3; 189:17-190-6; 190:18-20; 216:1-216:10.

**29** at 203-04 (overruling objection to question about a January 19, 2009 letter written by Debtors'
attorney on grounds that Mr. Davis had waived the privilege).

**V.      The Jury's Verdict.**

Starting on March 1, 2010, the Circuit Court presided over a nine-day jury trial.  After
hearing the evidence and testimony, the jury, on March 11, 2010, returned a verdict determining
that RSC was entitled to $36,350,239 in breach of contract damages from the Debtors and that each
Debtor was jointly and severally liable for the entire amount.  **Ex. 30**.  On March 17, 2010, the
Clerk of the Circuit Court entered and recorded Notices of Judgment on the judgment index in
favor of RSC and against the Debtors in the total amount of $36,350,239.  **Ex. 31**.

**ARGUMENT**

The Debtors' purpose in filing this adversary proceeding is transparent:  dissatisfied with
the adverse jury verdict, they want this Court to set it aside and declare that the entire Circuit Court
trial was a nullity.  Thus, the Debtors want this Court, as opposed to Maryland's state appellate
courts, to reverse the Circuit Court's judgment.  As a matter of law, the Debtors are not entitled to
the relief they seek; accordingly, the Debtors' Motion should be denied and RSC's Cross-Motion
should be granted.

The Motion, as well as the entire adversary proceeding, is based wholly on two procedural
decisions of the Circuit Court, neither of which provides any legal basis for finding that RSC
violated the automatic stay.  First, the Circuit Court allowed RSC to file a Third Amended
Complaint, and second, the Circuit Court ruled that certain communications between the Debtors
and their prior legal counsel were not privileged communications covered by the attorney-client
privilege and thus were discoverable by RSC and then admissible at trial.  Neither of these actions

constitute violation of the automatic stay.[7]  Even if these actions may have technically violated the stay, which RSC emphatically denies, the entry of the Second Remand Order by this Court and the determination by the Circuit Court that RSC's actions would not violate the stay, compel a finding that RSC did not willfully violate the stay and dictate that the stay should be modified retroactively so as to cover the actions of RSC that are the subject of this adversary proceeding.  Finally, if the Court does not grant RSC's Motion, it must deny the Debtors' Motion, which is based upon the Debtors' self-serving characterizations of documents that are disputed.

## I.     The Third Amended Complaint Did Not Violate The Automatic Stay.

Citing *In Re Wardrobe*, 559 F.3d 932 (9th Cir. 2009), the Debtors argue that the Third Amended Complaint violated the automatic stay.  In *In Re Wardrobe*, a creditor obtained relief from the automatic stay for the limited purpose of pursuing a breach of contract claim against the debtor's sureties.  *Id.* at 935.  The creditor thereafter pursued to judgment a claim against the debtor, not only for breach of contract, but also for fraud.  The creditor then claimed that the fraud judgment was not dischargeable.  The Ninth Circuit held that an order granting relief from the automatic stay "is effective only as to those claims actually pending in the state court at the time the order modifying the stay issues[.]"  *Id.* at 937.  That court explained that the rule "protects the

---

[7]      In their Complaint, the Debtors also claim that the Third Amended Complaint asserted a new theory of damages. Defendants' Verified Complaint at ¶20.  The Debtors never identify this purportedly new theory of damages, but, at the hearing on the Motion for Leave to File the Third Amended Complaint, they contended that delay damages were raised for the first time in the Third Amended Complaint.  To the extent the Debtors intend to make that assertion at some future time, it is false as a matter of law.  The Motion for Supplemental Relief, one of the operative pleadings at the time this Court issued its First Remand Order, detailed some of the increased costs to complete the apartment project caused by the Debtors' delay in performance and requested as delay damages "additional equity to re-start and complete the Apartment Project" and "all additional architect fees incurred in revising the construction drawings and all additional permit application fees required by Montgomery County[.]"  **Ex. 8** at ¶¶ 11, 12, 14, 17, and 18.  *See also* **Ex. 9** at ¶¶ 7 and 10.  Indeed, the Debtors designated a construction expert to refute RSC's delay damages claim.  *See* **Ex. 21A** at ¶ 4.  In any event, RSC did not proceed to trial on its delay damages claim.  The Debtors also contend that RSC violated the automatic stay by making statements to the press about the jury verdict.  Debtors' Verified Complaint at ¶ 43.  As with all of their other positions, Debtors cite no authority for the proposition that a statement to the press can constitute a violation of the automatic stay.

debtor, and other creditors, from unforeseen causes of action that could result in non-dischargeable judgments and furthers the purpose of the automatic stay." *Id.*

Even if the Ninth Circuit's decision were applicable here, in order to bring themselves within the rule announced in the *Wardrobe* case, the Debtors would have to establish that the Third Amended Complaint included a new cause of action. The Debtors cannot meet this requirement.[8]

### A.      Joint and Several Liability.

Not surprisingly, the Debtors do not claim that adding the phrase "joint and several liability" in the Third Amended Complaint purported to constitute a new cause of action against them. Nor could they. The Debtors simply ignore that portion of the *Wardrobe* case and claim, incorrectly, that joint and several liability was not an issue in the case when this Court entered its Remand Orders. Debtors' Mot. at 13. The Debtors have not, and cannot, establish that an assertion of joint and several liability, even if it had been raised for the first time in the Third Amended Complaint (although it was not), would have constituted a new claim. Moreover, the Debtors' contention that joint and several liability was not an issue in the case when the Remand Orders were issued is absurd. Finally, to the extent the Debtors intend to argue in the future that the imposition of joint and several liability is a new claim, they are wrong as a matter of law.

---

[8]        The Debtors' reliance on *In re Dalton*, 183 B.R. 127 (Bankr. S.D. Tex. 1995) is equally misplaced. In *Dalton,* relief from the stay was obtained to foreclose a lien on real property and obtain possession of it. The creditor then obtained a monetary judgment against the debtor personally. *Id.* at 129. Thus, as in *In re Wardrobe,* the creditor failed to obtain the bankruptcy court's permission to pursue a claim against the debtor and failed to obtain permission to pursue the specific cause of action tried to judgment. Neither of those facts is present in this case. By contrast, here the Court specifically lifted the stay to permit RSC to obtain monetary judgments against each of the Debtors and that is exactly what occurred.

1.    **Joint And Several Liability Has Been In The Case Since Its Inception.**

(a)    **The Joint And Several Liability Allegations Prior To The First Remand Order.**

The Complaint upon which the Declaratory Judgment was based stated claims against all four Debtors and referred to them collectively as the "Defendants." **Ex. 1A** at ¶ 1.[9]  The Complaint made clear that RSC was seeking to hold each Debtor liable for breach of each Ground Lease.  For example, RSC alleged that it had asked all four Debtors, including the Tower II Defendants, for estoppel certificates in connection with construction financing for the apartment building that the Tower I Plaintiff had the right to build under the Tower I Ground Lease.  *Id.* at ¶¶16, 20, and 21. RSC further alleged that the wrongful refusal of all of the "Defendants," including the Tower II Defendants, to execute estoppel certificates would, if not enjoined, interfere "with Plaintiffs' development rights under the Tower I Ground Lease."  *Id.* at ¶47.  Similarly, RSC alleged that the Tower I Defendants' actions constituted breach of the Tower II Ground Lease.  **Ex. 1A** at ¶31.  In its Declaratory Judgment, the Circuit Court specifically found that "Defendants' breaches of contract have prohibited Plaintiffs from obtaining a construction loan and financing" and ordered all four Debtors to provide estoppel certificates.  **Ex. 3** at 4.

After the Declaratory Judgment was issued, under the prevailing party clause of the parties' Ground Leases, the Circuit Court granted a judgment against the Debtors "jointly and severally" for litigation expenses both Plaintiffs have incurred.  **Ex. 4** at 2.  Under Maryland law, an award of litigation expenses is in the nature of damages for breach of contract.  *Collier v. MD-Individual Practice Assoc.*, 607 A.2d 537 (Md. 1992) (foreseeable attorneys' fees are consequential damages for breach of contract and would be awardable but for the "American Rule").  In other words, the

---

[9]    Because the Circuit Court pleadings refer to the Debtors as "Defendants" and RSC as "Plaintiffs" (the opposite of the parties' roles in this adversary proceeding), we use these terms interchangeably when referencing the proceedings in the Circuit Court and apologize to the Court for any confusion this may cause.

effect of the First Award was to hold each Debtor jointly and severally liable for the damages caused by the breaches of both Ground Leases.  As noted above, the Debtors dismissed their appeal from the First Award, which they then paid in full.  **Ex. 7**.

During the sixteen months that the Declaratory Judgment was on appeal, the Debtors refused to comply with it.  Because RSC suffered substantial injury in that time period, after the Declaratory Judgment was affirmed, RSC filed a Motion for Supplemental Relief and an Amendment by Interlineation to the then existing Complaint.  *See* **Ex. 8** and **9**.  The Motion and Complaint continued to seek to impose liability on each Debtor for breach of both Ground Leases and for the total amount of both Plaintiffs' injuries by seeking, among other things, a "monetary judgment in favor of Plaintiffs, and against Defendants, in an amount no less than $30 million, plus interest, which amount reflects the monetary damages and losses caused by Defendants' breaches of the Ground Leases and resulting interference with Plaintiffs' valuable development rights[.]" *See* **Ex. 9** at ¶7.

The Declaratory Judgment, the First Fee Award, the Motion for Supplemental Relief, and the Interlineated Complaint could leave no doubt that RSC was seeking to hold each Debtor liable for breach of both Ground Leases and for the entirety of the damages sustained by both Plaintiffs.

   **(b)**  **The Joint And Several Liability Allegations After The First Remand Order But Before Entry Of The Second Remand Order.**

The Second Remand Order is the order that allowed the underlying merits (as opposed to the litigation expenses) phase of the Circuit Court litigation to continue.  It is undisputed that before the Second Remand Order was issued, the Debtors expressed, on the record, their understanding that RSC was seeking to impose joint and several liability against them.  Thus, on August 5, 2009, before the Second Remand Order was issued, the Tower II Defendants filed a dismissal motion claiming that because the Complaint only alleged facts establishing breach of the Tower I Ground

Lease, and not the Tower II Ground Lease, the Tower II Defendants should be dismissed from the suit. **Ex. 13** at 21-22.[10]  Although that motion was filed in this Court, it was remanded for ruling by the Circuit Court, which denied it.  *See* **Ex. 34** at Docket No. 101.  If the Tower II Debtors did not interpret the Complaint as seeking to hold them liable for breaches of the Tower I Ground Lease, there would have been no basis for the arguments they made in their dismissal motion.

The Debtors were again put on notice that RSC was seeking to hold them jointly and severally liable by virtue of the proofs of claim filed on October 26, 2009, a month ***before*** the second hearing on the Remand Order and the issuance of the Second Remand Order.  Each of the proofs of claim in each case stated:

> Debtors are ***jointly and severally liable*** to Claimants for the amounts set forth in paragraph 9 above.  Therefore, a corresponding Proof of Claim is being filed by each of the Claimants with respect to each Debtor in each of the four pending bankruptcy proceedings.

**Ex. 18** at ¶10 (emphasis supplied).

Finally, pursuant to the First Remand Order, the Circuit Court entered the Second Fee Award, again finding each Debtor jointly and severally liable for litigation expenses, *i.e.,* the then-accrued damages caused by breaches of both Ground Leases.  **Ex. 14** at 1.  Had joint and several liability been a new issue in the case, as the Debtors now contend, they undoubtedly would have raised it in their appeal of the Second Fee Award or sought relief from this Court immediately after the Second Fee Award was entered on September 14, 2009.  The Debtors did neither.  **Ex. 32**.

In light of the Debtors' own dismissal papers, RSC's proofs of claim, and the Second Fee Award, the Debtors' contention that joint and several liability was not in the case before the Second Remand Order is unsustainable.

---

[10]    RSC does not agree with Debtors' argument.

      **(c)**     **The Debtors' Express Understanding That Joint And Several Liability Was In The Case After The Second Remand Order.**

After the Second Remand Order was issued, the Debtors continued to express their understanding that joint and several liability was an issue in the case. For example, on January 22, 2010, the Tower II Defendants filed a motion for summary judgment arguing that "neither of the Tower II Landlords is a party to the Tower I Lease," that RSC I "had absolutely no contractual relationship with the Tower II Landlord," that the Tower II Landlord had not "caused harm to either Plaintiff," and "[w]hatever claims Plaintiffs may have with respect to the NML transaction can only be asserted against the *Tower I Landlord*." **Ex. 26A** at 16-19 (emphasis in original). Obviously, the Debtors raised these arguments because they understood that joint and several liability was at issue in the case and that RSC was seeking to hold the Tower II Defendants liable for the damages flowing from the breaches of the Tower I Ground Lease, and vice versa. The Circuit Court rejected the Debtors' arguments and denied the summary judgment motion. *See* **Ex. 34** at Docket No. 120.

      **2.**     **Joint And Several Liability Is Not A "Claim."**

To the extent the Debtors, in an attempt to fit within the holding of *Wardrobe*, mean to argue at some future time that joint and several liability is a new cause of action, such an argument would be incorrect as a matter of law because legal theories do not constitute claims.

Maryland follows the transactional test for identifying a "claim," as set forth in Section 24 of the Restatement (Second) of Judgments. Under that test, a factual grouping constitutes a "claim" depending upon "whether the facts are related in time, space, origin, or motivation, whether they form a convenient trial unit, and whether their treatment as a unit conforms to the parties' expectations or business understanding or usage." *See Anne Arundel County B'd of Educ. v. Norville,* 887 A.2d 1029, 1038 (Md. 2005) (defining claim for purposes of *res judicata*). *See also*

*East v. Gilchrist,* 445 A.2d 343, 346 (Md. 1982) (defining claim for purposes of finality of judgment).

Maryland law is clear that legal **theories** do not constitute **claims**. Thus, for purposes of determining whether a judgment disposes of all claims such that it constitutes a final judgment, the Maryland Court of Appeals has said: "Different legal theories for the same recovery, based on the same facts or transaction, do not create separate 'claims[.]'" *East,* 445 A.2d at 346 (citations omitted). The Court of Appeals reached the same result in defining a claim for purposes of *res judicata.* "Even if a number of different legal theories casting liability on an actor may apply to a given episode, they do not create multiple claims[.]" *Norville,* 887 A.2d at 1039 (citations and internal punctuation omitted).

In *Norville,* the plaintiff asserted an ADEA claim in federal court against a Maryland County school board, which defended on sovereign immunity grounds. The plaintiff first argued that the Board was not entitled to immunity because it was not a state agency. The federal court disagreed and dismissed the suit. The plaintiff then asserted the ADEA claim in state court, arguing that the Board was not entitled to a sovereign immunity defense because it had been waived. The Court of Appeals held that, notwithstanding the plaintiff's new waiver theory, both complaints stated the same claim and, thus, the state court complaint was barred. "Legal theories may not be divided and presented in piecemeal fashion in order to advance them in separate actions." *Id.* at 1038; *see also Instant Tax Service v. TCA Financial, LLC,* 2009 WL 2579806 (D. Md. Aug. 17, 2009) (J. Messitte) (plaintiff, an individual, who was party to a franchise agreement with defendant and who lost an arbitration proceeding with defendant could not avoid the bar of *res judicata* by causing a limited liability company she operated in furtherance of the franchise to sue the defendant directly under a third party beneficiary theory). **Ex. 36.**

Here, the facts and circumstances giving rise to RSC's claims asserted in the operative pleadings at the time of remand are the same as those asserted in the Third Amended Complaint. The pleadings alleged that all of the Debtors breached the parties' Ground Leases and injured both of the RSC entities by refusing to give proper estoppel certificates and filing administrative appeals attacking RSC's governmental approvals. Those allegations constituted the "claims" at issue in the lawsuit. **Ex. 8 at ¶¶**1, 9, 10**; Ex. 9; Ex. 15** at ¶¶31, 32, 39-41; **Ex. 16** at ¶¶31, 32, 39-41.

At the time of remand, each of the RSC entities had stated all claims against all Debtors. Although, in the Third Amended Complaint, RSC stated the legal theories that it believed entitled it to assert joint and several liability against the Debtors, the claims themselves were already in the suit and did not change. Simply put, the Third Amended Complaint did not allege a new grouping of facts constituting a new transaction or "claim."

### 3.    Joint And Several Liability Is Not Substantive Consolidation.

The Debtors' attempt to characterize the Third Amended Complaint as a "substantive consolidation" defies explanation. One can only surmise that the Debtors seek to give the determination of joint and several liability more of a "bankruptcy flavor" so that they can argue that the issue was one more appropriately decided by this Court, rather than the Circuit Court. In their attempt to construct such an argument, the Debtors totally distort the concept of substantive consolidation.

The effect of a substantive consolidation is to pool all of the assets of different debtor entities (and sometimes non-debtor entities) so that the pooled assets may be shared equally among all of the creditors of each of the entities. If this were truly a substantive consolidation, as the Debtors claim, all of the creditors of each of the Debtors, not just RSC, would have the right to be

paid out of the assets of all of the Debtors. Stated differently, there would be one collective pool of assets and one collective pool of liabilities.

That is not at all the case here. The finding that the Debtors were jointly and severally liable to RSC had no effect on the claims of other creditors of the Debtors. Nowhere in the Circuit Court proceedings was there a determination that all creditors of the Debtors will have the right to share in the assets of all of the Debtors. Rather, the Third Amended Complaint did nothing more than seek a finding that two creditors, RSC Tower I and RSC Tower II, had claims for which all four Debtors were equally liable. Thus, the cases cited by the Debtors in the context of substantive consolidation are inapposite.[11]

### 4.   The Jury Verdict Accomplished Precisely What The Court's Remand Orders Intended – Liquidation Of Rsc's Claims.

Contrary to the allegations in the Debtors' Motion and as demonstrated above, the Third Amended Complaint did not introduce joint and several liability into the case as a new claim. The amendments did nothing more than clarify what had always been a part of the Circuit Court litigation, namely, that each of the Debtors was liable to each of the RSC entities for the entire amount of damages sustained. A finding of joint and several liability in favor of each RSC entity and against each Debtor does nothing more than fix the amount of the monetary claim that each RSC entity has against each Debtor, consistent with what was asserted in the unopposed proofs of claim filed by each RSC entity. That is precisely what this Court intended the Remand Orders to authorize – the adjudication by the Circuit Court of all of RSC's monetary claims. While the Debtors are undoubtedly dismayed with the jury's findings in this regard, they cannot seriously

---

[11]     To further illustrate the absurdity of their argument, what the Debtors are essentially saying is that whenever a single creditor has a claim against two or more debtors (they may be co-makers of a note, or one may be a guarantor of the other, or they may be joint tortfeasors), all *other* creditors then have the right to look to the assets of all of the debtors for satisfaction of their claims. This would make substantive consolidation the rule, rather then the exception.

contend that this Court reserved for itself the task of liquidating the monetary claims that each RSC entity had against each Debtor, or that this Court did not intend the Circuit Court to be the forum for resolving all such monetary claims in their entirety.

**B.      Breach Of The Covenant Of Good Faith And Fair Dealing.**

As noted above, at the time the Remand Orders were issued, RSC contended that the Debtors' refusal to give proper estoppel certificates and their administrative attacks on RSC's governmental approvals, both before and after the Declaratory Judgment, constituted breaches of express provisions of the Ground Leases.  One of the express provisions RSC claimed was violated was the duty under Section 9.3 to "reasonably cooperate" with RSC's development of the apartment towers.  *See, e.g.,* **Ex. 15** at ¶31, 57-60.  Indeed, that allegation was in the very first Complaint ever filed.  **Ex. 1** at ¶14.  Although there was no express allegation of breach of the implied covenant of good faith and fair dealing, it cannot be disputed that the implied covenant of good faith and fair dealing was an issue in the case from the beginning because that covenant is implied in every Maryland contract as a matter of law.

As Maryland appellate courts have repeatedly stated:  "Maryland law does not recognize an independent cause of action for breach of the implied covenant of good faith and fair dealing." *Cutler v. Waldash March Stores, Inc.*, 927 A.2d 1, 11 (Md. Ct. App. 2007) (citing authorities).  The implied covenant is part of an action for breach of contract.  *Id.*  As the *Cutler* court further explained in dismissing a stand-alone claim based upon the implied covenant:

> The implied duty of good faith prohibits one party to a contract from acting in such a manner as to prevent the other party from performing his obligations under the contract.  This duty is merely part of an action for breach of contract, and so, because one count already states a claim for breach of contract, the count purporting to state a claim for breach of the implied duty of good faith does not state a different claim and will be dismissed.

*Cutler*, 927 A.2d at 11-12 (citation and internal punctuation omitted).

It cannot be disputed that the Debtors believed their good faith to be an issue in the case even before the Declaratory Judgment was issued. Indeed, through prior counsel, the Debtors vigorously opposed the entry of the Declaratory Judgment, arguing that they could not be found liable for breach of the Ground Leases absent proof they acted in bad faith. Specifically, the Debtors' former counsel told both the Circuit Court and the Court of Special Appeals that whether the Debtors "acted in good or bad faith raises factual questions of motive and intent that cannot be resolved on summary judgment" and that the issue of the Debtors' good faith, bad faith, motive, and intent, could only be determined by a trial on the merits. *See* **Ex. 5** at 28-30. *See also* **Ex. 2** at 94 (claiming that RSC could not prevail on "anything less than a bad faith showing.").

On appeal from the Declaratory Judgment, the Court of Special Appeals specifically addressed the Debtors' good faith arguments. With specific reference to Section 9.3's requirement that the Debtors "reasonably cooperate," the appellate court noted that "in every contract there exists an implied covenant that the parties to the contract will act in good faith when dealing with each other. This duty of good faith and fair dealing prohibits one party from acting in such a manner as to prevent the other party from performing its obligations under the contract." **Ex. 6** at 48. The appellate court concluded "there is no evidence of a disputed fact [and] there was no good faith reason not to provide the requested estoppel certificates." *Id.* at 52-53.

Notwithstanding their prior arguments as to good faith and the Court of Special Appeals' express holding on that issue, after remand, the Debtors' new counsel filed a motion in limine arguing that the Debtors' good faith, bad faith, motive, and intent were irrelevant and not germane to the issues in the case. To moot that argument, absurd though it was, and to make crystal clear that the pleadings framed the issue, RSC expressly alleged violation of the implied covenant of good faith and fair dealing in the Third Amended Complaint.

Making express what is automatically implied under Maryland law did not introduce any new issue in the case, nor did it constitute a new claim that would violate the automatic stay or this Court's Remand Orders. Over a year before, the Court of Special Appeals had specifically addressed the duty of good faith and fair dealing in this case because, as it noted, that duty is implied in every Maryland contract. *Id.* at 48. Even if the implied covenant were not automatically at issue, the Debtors have failed to explain how including an express allegation as to breach of the implied covenant enlarged the scope of the Complaint in any way, given that the Debtors were already being accused of breaching the express duty of Section 9.3 to "reasonably cooperate."[12] Not only was the allegation of breach of the implied covenant of good faith and fair dealing not a new issue, as explained in *Cutler,* it was not a new cause of action as required to bring this case within the rule announced in *Wardrobe*.

## II.    The Orders On The Attorney-Client Privilege.

The Debtors next contend that the Circuit Court's discovery order concluding that the Debtors had waived the attorney-client privilege with respect to certain communications with their former counsel, Hogan & Hartson, LLP, and that other communications were not privileged in the first instance, was a violation of the automatic stay. The Debtors make the same contention with respect to the Circuit Court's ruling, during the trial testimony of Skip Davis, that the Debtors had opened the door to admission of the evidence during trial. This argument should be rejected on numerous grounds. The Debtors have cited no authority for the proposition that a discovery or evidentiary ruling in a remanded case can constitute a violation of the automatic stay. Nor can the

---

[12]    Tacitly acknowledging that their good faith was an issue in the litigation, the Debtors next contend that the Circuit Court erred by permitting evidence of their bad faith because that issue had already been resolved against them. Of course, a purportedly erroneous evidentiary ruling by the Circuit Court would not be a basis for finding that RSC violated the automatic stay.

Debtors credibly contend that, after remand, this Court reserved the right to oversee discovery disputes in the Circuit Court litigation or to rule on objections during trial.

As for discovery, both before and after the Second Remand Order was issued, the Debtors joined with Plaintiffs to file a consent amendment to the discovery schedule in the Circuit Court, not this Court.  **Ex. 17**; **Ex. 24**.  When discovery disputes arose after the Second Remand Order, the Debtors filed Motions for Protective Orders in the Circuit Court, not this Court.  **Ex. 22**; **Ex. 25**.  Indeed, the Debtors were the first to file a motion with respect to the Hogan & Hartson discovery and they filed it in the Circuit Court, not this Court.  **Ex. 25**.  The Debtors' actions are evidence of what is indisputably obvious:  When this Court remanded the case to the Circuit Court, it also remanded all discovery issues.

The evidentiary (as opposed to discovery) ruling that certain purportedly privileged communications were admissible was made during trial, after the Debtor's representative injected it into the case during his examination.  *See supra* footnote 6.  For the Circuit Court's rulings to constitute a violation of the automatic stay, this Court would have had to reserve for itself the right to rule on objections during trial, a ludicrous proposition.  There is no way the Remand Orders could reasonably be interpreted to call for such an unworkable bifurcation of the Circuit Court proceedings.[13]

The Debtors next contend that the allowance of the Hogan & Harston discovery "had an incredible impact on the course of the trial" and, therefore is a violation of the automatic stay.  Debtors' Mot. at 21.  Again, the Debtors cite no authority for this proposition.  Under that theory, any litigation activity in a remanded case that advances the creditor's claims and increases the

---

[13]    The Debtors made numerous objections during trial, further evidencing that they did not believe this Court had reserved the right to rule on the admission of evidence during trial.  *See, e.g.,* **Ex. 29** at 84, 98-101, 203-06.

likelihood of a judgment against the Debtors – such as effective cross-examination or a compelling closing argument – would constitute a violation of that automatic stay.   That is not the law.

Indeed, the only authority the Debtors cite, albeit inapposite, is a law review article in which the author contends that a bankruptcy examiner should not be permitted to waive the attorney-client privilege unless creditors have an opportunity to object.   In other words, the Debtors now claim that they did not have the authority to waive the attorney-client privilege.   Without conceding the accuracy of the Debtors' claim, the Debtors fail to explain how their purportedly unauthorized waiver of the attorney-client privilege constitutes a violation of the automatic stay by RSC.   As a matter of law, it does not.   First, it is far from clear that the attorney-client privilege constitutes property of the estate as defined in section 541 of the Bankruptcy Code.   As the Debtors themselves admit, this "is an issue that has been confounding legal scholars for many years."[14]   Second, and more to the point, we are not dealing with actions by examiners, nor are we dealing with actions by RSC; rather, we are dealing with the actions of the Debtors themselves.   Section 362 of the Bankruptcy Code does not prohibit the Debtors from waiving the attorney-client privilege, assuming it exists, nor does it make RSC responsible for the consequences of such a waiver.   The Debtors' attempt to elevate this purely evidentiary ruling into a claim of interference with estate property is simply specious.

## III.   The Circuit Court Has Already Held That The Stay Was Not Violated And That Decision Can Only Be Reviewed Through A Direct Appeal.

As discussed above, RSC, after this Court issued its Remand Orders, sought leave from the Circuit Court to file its Third Amended Complaint.   This was an entirely appropriate step for RSC to take, given that the Circuit Court had jurisdiction over that issue and was in the best position to

---

[14]       Debtors' Mot. at 20, quoting Jeffrey A. Deller, *Examining the Examiner:  Waiver of the Attorney-Client Privilege and the Outer Limits of an Examiner's Powers in Bankruptcy*, 43 Duq. L. Rev. 187, 205-208 (2005).

determine under Maryland law whether the amendments constituted new causes of action, as argued by the Debtors, or merely clarifications and technical amendments of claims that had already been asserted in the litigation at the time the Remand Order was entered. The Debtors clearly understood that the Circuit Court should decide that issue, as they filed an opposition contending that the amendment would violate the automatic stay, and chose not to raise the issue with this Court. The Circuit Court considered RSC's motion and Debtors' opposition, and then granted RSC leave to file the Third Amended Complaint. That determination cannot be collaterally attacked in this Court.

### A.    The Circuit Court Had Jurisdiction To Determine Whether The Third Amended Complaint Violated The Stay.

While the Bankruptcy Court has exclusive jurisdiction to grant relief from the stay "such as by terminating, annulling, modifying, or conditioning such stay" pursuant to section 362(d) of the Bankruptcy Code, it is the majority view that state courts have concurrent jurisdiction to determine whether a particular action is covered by the stay. This was precisely the holding of the Sixth Circuit in *In re Singleton*, 230 B.R. 533, 538-539 (6th Cir. 1999), where the debtor in a state court proceeding argued, as a defense, that his personal Chapter 13 bankruptcy stayed the sale of property owned by his corporation. The state court determined that the automatic stay did not prevent sale of the business property. The debtor chose not to appeal the state court decision, but instead filed an adversary complaint in the bankruptcy court alleging a violation of the automatic stay. The Sixth Circuit Court of Appeals noted that:

> [t]he Debtor confuses jurisdiction to grant relief from the stay under 11 U.S.C. § 362(d) with jurisdiction to determine whether the stay applies in the first instance. That the bankruptcy court may be the exclusive forum to consider a motion for relief from the automatic stay (citation omitted) does not preclude a nonbankruptcy court from determining whether a matter pending before it is stayed by a party's bankruptcy filing.

*Id.* at 538-39.[15]

The majority view has been followed by at least one District Court in the Fourth Circuit and has been adopted by the Maryland Court of Appeals.  *See Klass v. Klass*, 831 A.2d 1067 (Md. Ct. App. 2003):

> Although neither party has raised this issue, there appears to be some split of authority among Federal courts over whether any court, other than the Bankruptcy Court in which the bankruptcy proceeding is, or was, pending, has jurisdiction to determine whether action taken or proposed to be taken in a case pending in another court is subject to the automatic stay of § 362. The clearly predominant rule is that jurisdiction is concurrent, and that the court in which the non-bankruptcy case is pending may determine the effect of the stay on that case.
>
> ******
>
> In conformance with the prevailing view, however, we conclude that a Maryland court has, and, indeed, must have, jurisdiction to determine, at least in the first instance, whether and how a matter properly pending before it is affected by a § 362 stay. The State court may not grant relief from the stay-that is a matter committed exclusively to the Bankruptcy Court-but it may, when presented with the issue, determine whether, factually or legally, a stay is in effect and whether a particular action it is about to take or has already taken is subject to such a stay. Those determinations are, of course, reviewable on appeal.

*Id.* at 1071 (citations omitted).  *See also Cisneros v. Cost Control Marketing & Sales Management of Virginia, Inc.*, 862 F. Supp. 1531, 1533 (W.D. Va. 1994) (finding that U.S. District Court and the Bankruptcy Court "share concurrent jurisdiction to determine whether the automatic stay applies to

---

[15]    *See also NLRB v. Edward Cooper Painting, Inc.,* 804 F.2d 934, 939 (6th Cir.1986) ("'The court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but also the more precise question whether the proceeding pending before it is subject to the automatic stay.'") (quoting *Erti v. Paine Webber Jackson & Curtis, Inc.* (*In re Baldwin-United Corp. Litig.*), 765 F.2d 343, 347 (2d Cir.1985) (footnote omitted); *In re Oakwood Acceptance Corp.*, 308 B.R. 81 (Bankr. N.M. 2004) (bankruptcy courts have core jurisdiction to terminate, modify or annul stay, but state courts have authority to determine whether the stay applies to proceedings before them); *In re Glass,* 240 B.R. 782 (Bankr. M.D. Fla.1999) (the court in which the litigation claimed to be stayed is pending has jurisdiction to determine not only its own jurisdiction but whether the proceeding pending before it is subject to the automatic stay); *Matter of Pope,* 209 B.R. 1015, 1020 (Bankr. N.D. Ga.1997) (the applicability of the automatic stay falls concurrently within the purview of the Bankruptcy Court and that of the state court); *In re Conference of African Union First Colored Methodist Protestant Church,* 184 B.R. 207, 215 (Bankr. D. Del.1995) (a motion to modify or lift the automatic stay with respect to a particular action must be made to the Bankruptcy Court; in contrast, the issue of the applicability of the automatic stay to the litigation in question is within the competence of both courts — the court in which the litigation is pending and the Bankruptcy Court supervising the reorganization); *In re Mann,* 88 B.R. 427, 430 (Bankr. S.D. Fla.1988) (state court has concurrent jurisdiction over applicability of stay to contempt proceedings arising out of alimony and child support award); *contra, In re Gruntz,* 166 F.3d 1020 (9th Cir. 1999), *opinion amended and superseded by* 177 F.3d 728 (9th Cir.1999), *reh'g en banc granted, opinion withdrawn by* 177 F.3d 729 (9th Cir.1999), *opinion after reh'g* 202 F.3d 1074 (9th Cir.2000).

this proceeding"). In an analogous situation, the Fourth Circuit has held that a state court decision as to whether a debt is dischargeable may not be re-litigated by the debtor in the bankruptcy court. *In re Barsh*, 2006 WL 2485852 at *6 (4th Cir. 2006).

Not only did the Circuit Court have jurisdiction over whether the Third Amended Complaint was subject to the stay, it was in the best position to make that determination, having presided over the case for more than three years. The Circuit Court was intimately familiar with what claims, issues, and arguments had been raised by both parties and with what constitutes a new cause of action under Maryland law. Under similar circumstances, the *Cisneros* court held "[t]his court has been handling this case for approximately five years and, therefore, presumably is more familiar than the Bankruptcy Court with the nature of the action." 862 F. Supp. at 1533.

The Debtors acknowledged that the Circuit Court had the authority to rule on whether RSC's amendments to the Complaint violated the stay, as evidenced by the fact that they filed a detailed Opposition attempting to convince the Circuit Court that there was a violation. *See* **Debtors' Mot. at Ex. I** at 5 ("any amendments to the existing complaint in the state court case not specifically authorized in advance by the bankruptcy court *are barred by the automatic stay*[.]") (emphasis in the original). If the Debtors thought otherwise, they had an obvious avenue for redress – they could have sought an expedited ruling from this Court. They had sufficient time to make such a request.[16] Instead, the Debtors made the conscious decision not to seek a ruling from this Court, but to allow the Circuit Court to exercise its concurrent jurisdiction to decide the issue. Having made this choice, the Debtors are now precluded from re-litigating the issue in the guise of this adversary proceeding.

---

[16]     The Motion for Leave to Amend was filed on February 16, 2010 and trial was not scheduled to begin until March 1, 2010.

**B.      The Circuit Court's Ruling That The Stay Was Not Violated Cannot Be Collaterally Attacked In This Court.**

This Court must give effect to the Circuit Court's conclusion that the Third Amended Complaint did not violate the automatic stay pursuant to the Rooker-Feldman doctrine, which provides that this Court does not have jurisdiction to act as an appellate court with respect to the Circuit Court's decisions, including a decision regarding the scope of the automatic stay.   The Rooker-Feldman doctrine is based on the principal that "federal trial courts have only original subject matter, and not appellate, jurisdiction [and] ... may not entertain appellate review of [or collateral attack on] a state court judgment." *In re Johnson,* 210 B.R. 1004, 1006 (Bankr. W.D. Tenn.1997).

This adversary proceeding runs directly counter to the principals of the Rooker-Feldman doctrine and illustrates why the doctrine exists.   Having litigated the issue of whether RSC's amendments to the Complaint constituted new causes of action in violation of the stay, Debtors cannot now seek to have this Court serve, in effect, as a court of appeals to the Circuit Court's decision.   As the Sixth Circuit explained in *Singleton,* discussed in section III(A) above: "*Rooker/Feldman* has often been applied to preclude bankruptcy court review of state court decisions.  . . . 'The Bankruptcy Code was not intended to give litigants a second chance to challenge a state court judgment nor did it intend for the Bankruptcy Court to serve as an appellate court.'" 230 B.R. at 537-38 (citation and internal punctuation omitted).  Accordingly, the Court of Appeals found that under the Rooker-Feldman doctrine, the bankruptcy court lacked the authority to review whether the state court had correctly ruled on whether a stay order applied to a sale of the debtor's company's property. *Id.* at 538.

The same decision was reached in *In re Siskin*, 258 B.R. 554 (Bankr. E.D.N.Y. 2001). There, the debtor had lost a state court proceeding and been held in contempt for failure to comply

with post-judgment discovery, resulting in the issuance of an arrest warrant. After he filed for bankruptcy, he was arrested on the warrant. He argued to the state court that his arrest violated the automatic stay and the state court disagreed. Thereafter, he commenced an adversary proceeding in the bankruptcy court for violation of the stay. Rejecting the debtor's arguments, the Court held that the "*Rooker-Feldman* doctrine precludes this Court from upsetting a New York Supreme Court judgment which determined that the automatic stay did not apply to the contempt proceedings before it, absent the enactment by Congress of a statue specifically depriving State Courts of jurisdiction to determine in the first instance whether the automatic stay applies to it." *Id.* at 557.[17] *Accord*, *In re Ivani*, 308 B.R. 132, 136-38 (Bankr. E.D.N.Y. 2004) (state court had concurrent jurisdiction to interpret scope of automatic stay and *Rooker-Feldman* doctrine bars bankruptcy court from reviewing the state court's findings). *See also In re Bona*, 124 B.R. 11 (S.D.N.Y. 1991) (bankruptcy court was bound by state court determination that automatic stay did not apply to a capias writ and was barred from re-litigating the issue on principles of *res judicata* and collateral estoppel).

Similarly, the Fourth Circuit held that a state court decision as to dischargeability was not subject to collateral attack in the bankruptcy court. *See In Re Barsh*, 2006 WL 2485 852 at *7. There, the State of Maryland Central Collection Unit ("CCU") obtained a pre-petition judgment for unpaid fines, attorneys fees and court costs against the debtor for failing to maintain required automobile insurance. The debtor filed for bankruptcy and was granted a discharge. The CCU then sought to garnish the debtor's wages, which the debtor opposed, both in the state court and the bankruptcy court, based on the discharge. The state court determined that the debt was a non-dischargeable penalty under Section 523(a)(7) and allowed the garnishment to continue. After the

---

[17]     The Court carefully considered, and expressly rejected a contrary decision reached by the Ninth Circuit in *In re Gruntz*, 202 F.3d 1074 (9th Cir. 2000).

state court decision was issued, the bankruptcy court determined that the portion of the judgment relating to attorneys' fees and court costs was dischargeable, a ruling which the District Court affirmed.  On appeal, the Fourth Circuit vacated the bankruptcy court's ruling, holding:  "[debtor's] claim that his debt had been discharged in bankruptcy was litigated in the state court.  By litigating the claim there, [the debtor] is precluded from doing so again in this forum."  2006 WL 2485 852 at *7.  *Cf. Cisneros*, 862 F. Supp. at 1533 (district court declined to abstain from determining whether pending action violated automatic stay in favor of bankruptcy court because "[i]n all cases of concurrent jurisdiction, the court which first has possession of the subject must decide it" and "long-standing principles of comity suggest that it is appropriate for this Court, rather than the Bankruptcy Court, to decide the issue because the proceeding was first filed in this Court.").

Here, the Debtors raised the issue of the automatic stay in front of the Circuit Court, which ruled that there was no violation of the stay.  They cannot now seek a different ruling from this Court.

## IV.    To The Extent This Court Concludes The Circuit Court Exceeded The Scope Of The Remand Orders, This Court Should Retroactively Modify The Stay And Its Remand Orders.

Pursuant to Section 362(d) of the Bankruptcy Code, "[o]n request of a party in interest and after notice and a hearing, the court shall grant relief from the stay provided under subsection (a) of this section, such as by terminating, annulling, modifying, or conditioning such stay (1) for cause, including the lack of adequate protection of an interest in property of such party in interest[.]."  To the extent this Court concludes that it can or should review the Circuit Court's ruling that RSC did not violate the stay, and further concludes that the Circuit Court, in presiding over the jury trial, exceeded the scope of this Court's Remand Orders, this Court should retroactively modify the automatic stay and its Remand Orders.

The Debtors' own authority shows that "if a judgment has been entered on a cause of action that was not pending at the time the [remand] relief was granted, [a creditor] could seek retroactive relief from the stay that is broad enough to encompass the judgment[.]"  *In Re Wardrobe*, 559 F.3d at 937 (citing authorities).  Judge Bostetter reached the same conclusion when he granted an annulment of the automatic stay and retroactive relief in *In Thompson v. Board of Trustees of the Fairfax County Police Officers Retirement System*, 182 B.R. 140 (Bankr. E.D. Va. 1995), *aff'd,* 92 F.3d 1182 (4th Cir. 1996).

In *Thompson*, the debtor, a retired police officer, had received overpayment of his retirement benefits from the creditor.  The creditor withheld payment of retirement benefits from the debtor to recover the earlier overpayments.  The debtor filed for bankruptcy, and then alleged that the withholding violated the automatic stay.  Judge Bostetter held that the fact that the debtor had very few creditors and appeared to have alleged a violation simply to extract benefits from the creditor to which he was not entitled, justified retroactive relief from and annulment of the automatic stay:

> A cursory review of the bankruptcy schedules reveals that Thompson has very few creditors and has even fewer, if any, non-exempt assets from which a distribution can be made. In this instance, Thompson has not pursued bankruptcy as a way of addressing the demands of many unsecured creditors. Instead, Thompson has tried to use the automatic stay as leverage for obtaining benefits he could not otherwise receive outside of bankruptcy. Accordingly, the circumstances of this case dictate that we enter an order annulling the automatic stay, effective as of the petition date. Because an annulment of the stay has the effect of validating the Board's actions, we find that no "violation" of the stay has occurred.

*Id.* at 155.

Judge Mannes reached the same result In *In Re Lampkin*, 116 B.R. 450 (Bankr. Md. 1990), when he annulled the automatic stay for a secured creditor who had purchased the debtor's real property at a foreclosure auction during the pendency of the debtor's bankruptcy case, which was

ultimately dismissed.  As Judge Mannes explained, "The practical reality of the situation is that unless [the creditor] can persuade the court to annul the stay, it must conduct another foreclosure of the property.  This would prejudice it, the debtor, and the subsequent transferee and benefit no one."  *Id.* at 453.  Judge Mannes concluded that, given the "importance" of the automatic stay, and the fact that the effect of an annulment "is to negate its existence in its entirety," nothing short of a complete annulment was required under the circumstances. *Id.* "[T]he court would hesitate to validate any unknowing violations by less than an annulment." *Id.*

    In a factually similar case to this one, the U.S. Bankruptcy Court for the Western District of Missouri granted retroactive relief from the automatic stay.  *In re Harris*, 268 B.R. 199 (Bankr. W.D. Mo. 2001).  In *Harris*, the debtors and creditors were involved in state court litigation.  The creditors sought and were granted relief from the automatic stay to proceed with the state court litigation.  The order granting relief from the stay specifically referenced the case number of the pending litigation.  The parties dismissed the pending case by stipulation, and the creditors re-filed the action the next day.  The new action omitted one claim and named only one defendant, but was identical in all other respects to the case which had been dismissed.  The new action also was assigned a new case number.  The parties proceeded with the new case, and the court entered a judgment in favor of the creditors.  Thereafter, the debtors appealed the judgment and raised the issue of the violation of the automatic stay for the first time before the state appeals court.  The creditors filed a motion for annulment of, or retroactive relief from, the stay in the bankruptcy court.  In granting retroactive relief from the stay, the court noted the compelling circumstances of the case:  the creditors had already been granted relief from the stay, and the court likely would have granted them additional relief if so requested; the violation of the stay was technical in nature and would amount to "putting form over substance" under the facts of this case; and the debtors

"allowed the state court action to proceed under the new case number, and actively defended themselves in that action, without ever suggesting that the [creditors] were violating the automatic stay in pursuing that action." *Id.* at 203.[18]

Here, even if the Debtors' arguments that RSC somehow technically violated this Court's Remand Orders had any merit, cause exists for the Court to grant an annulment of, or relief from, the automatic stay for several reasons. First, Debtors have not been prejudiced by any purported violation of the automatic stay. The jury verdict finding that Debtors had breached the Ground Leases, that the breaches had damaged each RSC Entity, and that each Debtor was liable for the damages – regardless of the theories on which the verdict was decided – did nothing more than fix the amount of the monetary claim that each RSC entity has against each Debtor. As noted above, that is precisely what this Court intended the Remand Orders to authorize – the adjudication of RSC's monetary claims.

Second, the Debtors actively participated in the Circuit Court litigation after the Third Amended Complaint was filed. Only after an unfavorable judgment was entered against them did Debtors raise the issue of a stay violation in this Court. At least one bankruptcy court has held, under similar circumstances, that a debtor's failure to promptly raise a purported violation of the automatic stay with the bankruptcy court constitutes a waiver of any purported violation. "To hold otherwise would allow a [Debtor] to have a trump card that he could play if he did not like the outcome of the action, but allowing him to take a favorable judgment." *In Re Cobb*, 88 B.R. 119,

---

[18]    *See also In re Hoskins*, 266 B.R. 872, 878-79 (Bankr. W.D. Mo. 2001), in which the court found "compelling circumstances which warranted retroactive relief from the automatic stay" where the debtors chose to participate in a hearing on a creditor's motion for summary judgment in an adversary proceeding that had been removed by the creditor post-petition without first getting relief from the stay. The Court noted that "[i]t would be manifestly unjust to allow [the debtors] to fully participate in the adversary proceeding, then allow them to pursue their motion asserting a violation of the automatic stay after the Court rendered judgment in favor of [the creditor]."

121 (Bankr. W.D. Tx. 1988). Undoubtedly, if the jury verdict had been in Debtors' favor, they would not be contending that the verdict was a nullity or that RSC was entitled to a "do over."

Third, RSC sought and was granted relief from the automatic stay in order to pursue the Circuit Court litigation. RSC did not think, and still does not think, that the Third Amended Complaint violated the automatic stay or was beyond the scope of the relief granted in the Second Remand Order. Had RSC thought the amendment was problematic, it would have sought additional relief from the automatic stay.

Fourth, the practical reality of the situation is that, unless the Court grants an annulment of, or retroactive relief from, the stay (assuming it finds that the trial exceeded the scope of the Remand Orders), the jury trial in the Circuit Court will have to be held again, at great expense to the Debtors, RSC, and the judiciary, as well as additional cost and delay to resolution of these bankruptcy cases. If the Court deems that RSC's actions in amending the Complaint violated the automatic stay, cause certainly exists to annul or retroactively grant relief from the stay pursuant to Section 362(d)(1) of the Bankruptcy Code. Upon granting such annulment or retroactive relief, "the action [in question] is not void because no stay violation has occurred." *Hoskins* at 879, quoting *In re Smith*, 245 B.R. 622, 624 (Bankr. W.D. Mo. 2000).

**V.      Debtors Are Not Entitled To Damages.**

In the Stay Complaint, the Debtors seek an award of actual damages, including their costs and attorneys' fees, as well as punitive damages. As a matter of law, they are not entitled to such relief, and summary judgment on these damage claims should be granted in favor of RSC.

Section 362(k)(1) of the Bankruptcy Code permits the recovery of damages only when there has been a "willful violation" of the automatic stay. While the requirement of "willfulness" does not require a finding that the creditor specifically intended to violate the stay, it does require a

finding that the creditor was aware of the existence of the automatic stay[19], a finding that cannot be made here.  First, RSC properly sought and obtained relief from the stay from this Court, and thus had every reason to believe that the stay was no longer in effect with respect to the actions being taken in the Circuit Court proceedings.  Second, RSC's beliefs were borne out when the Circuit Court, in the proper exercise of its concurrent jurisdiction, found that the actions of RSC were not barred by the stay.  Under these circumstances, as a matter of law, it cannot be found that RSC's actions constituted a willful violation of the stay.[20]

## VI.    If The Court Does Not Grant Rsc's Motion For Summary Judgment, It Cannot Grant The Debtors' Motion Because There Are Disputed Issues Of Fact.

RSC contends that the documentary evidence and hearing transcripts cannot be disputed and require judgment in its favor.  By characterizing, rather than quoting, from some documents, and by ignoring others, the Debtors seek to convince this Court otherwise.  RSC maintains that the Debtors' characterizations and half-truths are not evidence sufficient to avoid summary judgment in RSC's favor.  If the Court is inclined to give credence to the Debtors' characterizations of the evidence, it cannot grant summary judgment in the Debtors' favor based upon those characterizations, which are disputed.

For example, the Debtors contend that "[t]he Circuit Court ruled that all documents reflecting attorney-client communications in the possession of Hogan & Hartson had to be turned over to the RSC Entities" and that the Debtors were "precluded from instructing the [Hogan & Hartson] witness not to answer on grounds of the attorney-client privilege." Debtors' Mot. at 18.

---

[19]    See, e.g., *Thompson-Mendez v. St. Charles at Olde Court P'ship, LLC (In re Thompson-Mendez)*, 321 B.R. 814, 820 (Bankr. D. Md. 2005) ("...a violation is considered willful if the creditor knew of the automatic stay and intentionally performed the actions that violated the stay." (quoting *Ford Motor Credit Co. v. Hemsley (In re Bennett)*.

[20]    RSC also disputes the Debtors' allegations of damages flowing from the alleged stay violation.  However, because RSC is entitled to summary judgment on these claims for the reasons discussed herein, it is not necessary to address the specifics of these arguments.

RSC has submitted evidence that the Circuit Court did not order "all" documents reflecting attorney-client communications in Hogan & Hartson's possession to be produced, but only ordered the production of the 9 categories of documents requested by RSC in its subpoena *duces tecum*. **Ex. 21** at Attachment A; **Ex. 27A**. RSC has also submitted evidence that the Circuit Court did not order the production or admission of ***privileged*** information, having found that some of the information was not privileged in the first instance or not privileged as a result of waiver. *See, e.g.,* **Ex. 29** at 98-101, 202-04. RSC has also submitted evidence that the Circuit Court did not order a Hogan & Hartson representative to disclose all communications with the Debtors, but only communications on the five subject matters covered by RSC's *subpoena duces tecum*. **Ex. 27A**. The Debtors have submitted no evidence supporting their contention that the Circuit Court prohibited them from invoking the privilege at the Hogan & Hartson deposition with respect to matters not covered by the subpoena *duces tecum*. With respect to the Debtors' contention that the issue of joint and several liability and the implied covenant of good faith and fair dealing were not at issue in the case until the Third Amended Complaint, Debtors have submitted substantial evidence establishing a dispute of fact on this issue.[21] If summary judgment is not granted in RSC's favor, the Debtors' summary judgment motion must be denied.

## CONCLUSION

WHEREFORE, for the foregoing reasons, RSC requests that this Court (a) deny in its entirety the Debtors' Motion for Partial Summary Judgment, (b) grant RSC's Cross-Motion for

---

[21]     *See* **Ex. 1** at ¶14 (Verified Complaint); **Ex. 1A** at ¶1, 16, 20, 21, 31, 47 (Amended Verified Complaint); **Ex. 2** at 94 (Summary Judgment Hearing Transcript); **Ex. 3** (April 4, 2007 Orders/Judgments)**; Ex. 4** (First Fee Award); **Ex. 5** at 28-30 (Debtors' Appellate Brief Re: April 4, 2007 Orders/Judgments); **Ex. 6** at 48, 52-53 (Court of Special Appeals' Opinion); **Ex. 8** (Motion for Supplemental Relief); **Ex. 9** (Amendment by Interlineation of Amended Verified Complaint); **Ex. 14** at 1 (Second Fee Award); **Ex. 15** at ¶31, 57-60 (Second Amended Complaint); **Ex. 18** at ¶10 (Proofs of Claim in all four debtor cases); **Ex. 26** at 16-19 (January 21, 2010 hearing transcript); **Ex. 32** (Defendants' Appellate Brief from Second Fee Award).

Summary Judgment, (c) dismiss this adversary proceeding with prejudice, and (d) grant such other and further relief as is just and equitable.

Respectfully submitted,

*/s/ Lawrence A. Katz*
Lawrence A. Katz (Fed. Bar No. 02526)
VENABLE LLP
8010 Towers Crescent Drive
Suite 300
Vienna, VA  22080
(703) 760-1921
Fax:  (703) 821-8949
*Counsel to RSC Tower I, LLC and RSC Tower II, LLC*

## CERTIFICATE OF SERVICE

I hereby certify that on this 12th day of July, 2010, a copy of the foregoing RSC Tower I, LLC and RSC Tower II, LLC's (A) Opposition To Debtors' Motion For Partial Summary Judgment, And (B) Cross-Motion For Summary Judgment was served by electronic mail and first-class mail, postage prepaid, on

Stephen Nichols, Esquire
Nelson Deckelbaum, Esquire
Cooter Mangold Deckelbaum & Karas, LLP
5301 Wisconsin Avenue, N.W.
Suite 500
Washington, D.C. 20015


Roger Frankel, Esq.
Jonathan P. Guy, Esq.
ORRICK, HERRINGTON & SUTCLIFFE LLP
Columbia Center
1152 15th Street, NW
Washington, D.C.  20005-1706


Office of the U.S. Trustee
6305 Ivy Lane
Suite 600
Greenbelt, Maryland  20770


*/s/ Lawrence A. Katz*_____
Lawrence A. Katz